788 A.2d 291 (2002)
346 N.J. Super. 372
In the Matter of Mark HOLMES, Candidate for Lawrence Township Council, for a Recount of Voting Districts and Election Contest in Lawrence Township.
Superior Court of New Jersey, Appellate Division.
Argued December 20, 2001.
Decided December 27, 2001.[1]
Filed January 14, 2002.
Peter Sheridan argued the cause for appellant Mark Holmes, (Graham, Curtin & Sheridan, attorneys; Mr. Sheridan, of counsel and on the brief; Dorothy A. Harbeck and Christopher J. Keale, on the brief).
Arthur Sypek, Jr. argued the cause for respondents Mark Sebastian and Michael Powers, (Teich, Groh, Frost & Zindler, attorneys; Mr. Sypek, of counsel and on the brief).
Mark T. Holmes, Deputy Attorney General, argued the cause for amici curiae State of New Jersey, (John J. Farmer, Jr., Attorney General, attorney; Mr. Holmes and Donna Kelly, Deputy Attorneys General, of counsel; Mr. Holmes, on the brief).
Before Judges WEFING, CIANCIA, and PARRILLO.
The opinion of the court was delivered by PARRILLO, J.A.D.
This matter results from the November 6, 2001 election for two seats on the Lawrence Township Council. Following the *293 November 6 election, the Board of Elections (Board) reported that Richard Miller and Michael Powers were the two highest vote-getters of the four candidates and, therefore, they were to be awarded the seats. As of those election results, Mark Holmes and Mark Sebastian trailed second-place Michael Powers by one vote and five votes, respectively. As of a November 30 recount Powers had increased his lead over candidate Holmes to three votes. Upon candidate Holmes' motion, the Superior Court, Law Division, considered whether forty-one sealed absentee ballots, along with votes trapped in the Hamilton Regional Postal Facility (Facility) as of October 18[2], should be counted although they were not received by the Board by November 6.
Following oral argument, the trial court issued an order, dated December 13, 2001, finding that (1) twenty-three absentee ballots, which were received by the Board on November 7 and 8, and eighteen absentee ballots, which were received by the Board after November 8, were not timely and should not be canvassed by the Board; and (2) absentee ballots locked in the Facility as of October 18 should be deemed timely and canvassed by the Board if received by the Board by December 27. In addition to N.J.S.A. 19:57-23, the trial court relied on DeFlesco v. Mercer County Board of Elections, 43 N.J.Super. 492, 129 A.2d 38 (App.Div.1957) and Mulcahy v. Bergen County Board of Elections, 156 N.J.Super. 429, 383 A.2d 1214 (Law Div. 1978).
We entertained appellant Holmes' application for relief from the first portion of the trial court's December 13, 2001 order disallowing absentee ballots received by the Board after Election Day, November 6, 2001, on an emergent basis because the Lawrence Township Council reorganization was scheduled to occur prior to the date on which we would have considered a motion in the ordinary course.[3]R. 2:9-8. We treated the trial court's order as interlocutory in nature, granted appellant's motion for leave to appeal, R. 2:2-4, accelerated the proceedings, and elected to consider the merits of the appeal, R. 2:11-2. We now reverse that portion of the trial court's order disallowing the count of absentee ballots received by the Board on November 7, 2001 and postmarked prior to November 6, 2001.
Apart from the absentee ballots locked in the Facility as of October 18, 2001, there were forty-one absentee ballots originally at issue. Of these, two bear no postmark date and six bear a postmark date of November 6, 2001 or later. On appeal, appellant does not challenge these eight absentee ballots as being timely delivered under N.J.S.A. 19:57-23 and, therefore, they are not included within the subject matter of this appeal. Of the thirty-three remaining absentee ballotsall postmarked prior to November 6, 2001nineteen were received by the Board on November 7, 2001; three were received by the Board on November 8, 2001; and eleven were received *294 by the Board between November 9 and November 21, 2001. For the reasons that follow, we hold that the nineteen absentee ballots postmarked before November 6, 2001 and received by the Board on November 7, 2001 are to be opened and counted by the Board.
It is undisputed, based on the record below, that the closure, sealing, and quarantine of the Facility on October 18, 2001 to date by federal authorities due to anthrax contamination caused the delay in mail delivery by one day. While other, more standard conditions may have accounted for additional time delays, Acting Postmaster General Joseph Sautello testified that the rerouting for processing of the absentee ballotsi.e. first class letters that typically would be delivered through the Facilityoccasioned by the October 18, 2001 closing of the Facility, generated a one-day delay in delivery time.[4] Postmaster General Sautello also testified that in his twenty-six years with the postal system, there has never been a closure of this magnitude. No one disputes that the October 18, 2001 closure of the Facility due to anthrax contamination was an extraordinary circumstance of national dimension and unforeseen consequence.[5]
It is against this background that we view the issue at hand. N.J.S.A. 19:57-23 provides that an absentee ballot must be received by the county board of elections or its designees before 8:00 P.M. on the day of election. Although the statute appears straightforward, "it must be read in light of the broad purpose of the election laws to prevent disenfranchisement of qualified voters," In re Gray-Sadler, 164 N.J. 468, 476, 753 A.2d 1101 (2000) (concerning write-in votes); in accordance with the overall legislative pattern, Application of Langbaum, 201 N.J.Super. 484, 489, 493 A.2d 580 (App. Div.1985); and in a common-sense way that accords with the legislative purpose. In re Petition of Battle, 96 N.J. 63, 64, 473 A.2d 980 (1984); Wene v. Meyner, 13 N.J. 185, 197, 98 A.2d 573 (1953); In re Application of Langbaum, supra, 201 N.J.Super. at 489, 493 A.2d 580; North Wildwood v. Taxpayers' Ass'n., 338 N.J.Super. 155, 163, 768 A.2d 262 (Law Div.2000); Marotta v. Burgio, 185 N.J.Super. 172, 179, 447 A.2d 937 (Law Div.1982). Such laws are to be liberally construed so as to effectuate their purpose. N.J.S.A. 19:57-3; Lesniak v. Budzash, 133 N.J. 1, 7, 626 A.2d 1073 (1993); Wene, supra, 13 N.J. at 197, 98 A.2d 573; Kilmurray v. Gilfert, 10 N.J. 435, 440, 91 A.2d 865 (1952); In re Application of Langbaum, supra, 201 N.J.Super. at 489, 493 A.2d 580; Pritel v. Burris, 94 N.J.Super. 485, 492, 229 A.2d 257 (App. Div.1967); In re Chirico, 87 N.J.Super. 587, 593, 210 A.2d 415 (App.Div.1965); Murphy v. State Canvassing Bd., 12 P. 3d 677, 681 (Wyo.2000) (discussing New Jersey's liberal construction of election laws).
In this regard, "courts are loath to invalidate a vote of any citizen." In re Petition of Battle, supra, 96 N.J. at 64, 473 *295 A.2d 980. To be sure, the statutory right to vote as an absentee is subject to proper legislative limitation. Application of Langbaum, supra, 201 N.J.Super. at 489, 493 A.2d 580. However, the technical requirements of N.J.S.A. 19:57-23 must be read in light of the overall legislative pattern. Ibid. Admittedly, deterrence of fraudmaintenance of the integrity of the electoral processis one of the primary legislative concerns. Id. at 490, 493 A.2d 580. Here, significantly, there are no allegations of voter fraud or malconduct and the record is barren of any such evidence. We previously stated, albeit in different circumstances, that "[v]oiding the ballot and thus disenfranchising the voter is too harsh a remedy where the deficiency does not affect the integrity of the electoral process." Ibid.
We do not believe that the Legislature intended N.J.S.A. 19:57-23 to be applied in a manner that would prevent otherwise valid absentee ballots from being counted when, in the absence of voter fraud or malconduct, it has been conclusively demonstrated that such absentee ballots would have been timely delivered but for the extraordinary and unpredictable circumstance experienced in this case.[6] Otherwise, a rigid application of the rule that all ballots be received by the board by 8:00 P.M. of Election Day would unfairly deprive absentee voters of their franchise as a result of exceptional circumstances neither within their control nor which, in light of human experience, might reasonably be expected. Nor in this case would imposition of the time requirement be reasonably necessary to prevent election fraud, which has been neither alleged nor proven.
Neither DeFlesco v. Mercer County Board of Elections, 43 N.J.Super. 492, 129 A.2d 38 (App.Div.1957), nor Mulcahy v. Bergen County Board of Elections, 156 N.J.Super. 429, 383 A.2d 1214 (Law Div. 1978), is to the contrary. In DeFlesco, no reason was given for the delay in receipt of the absentee ballots. In Mulcahy, untimely delivery of the absentee ballot was due to inclement weather, a clearly foreseeable event"a factor that may occur any year and all voters may be confronted with it," 156 N.J.Super. at 437, 383 A.2d 1214for which the voter assumes the responsibility and the risks of non-delivery.
In comparison, here, the eventunprecedented, unparalleled and unpredictable, national in scope, and of far-reaching consequencehas been indisputably established as the direct cause for a one-day delay in the delivery of the absentee ballots at issue in this case. For these reasons, therefore, we reverse in part the trial court's order of December 13, 2001 and we direct that the Board open and count all absentee ballots postmarked prior to November 6, 2001 and received by the Board no later than November 7, 2001. In all other respects, the December 13, 2001 order is affirmed.
NOTES
[1] This matter was disposed of by an order dated December 27, 2001. A formal opinion is now being filed.
[2] On October 18, 2001, the Facility closed due to several anthrax-tainted letters having been processed there. Mail situated inside the Facility as of that date was sealed inside and then transported to Bridgeport to undergo irradiation.
[3] Originally scheduled for January 1, 2002, the township council's reorganization was postponed to January 6, 2002 because of the pending litigation.
[4] Postmaster General Sautello testified thus:

In normal situations, prior to October 18th when we closed that facility, if you mailed a letter in the Trenton area, and it was originating in Trenton and destinating [sic] in Trenton, in the test that we do for the service, we found that we delivered that mail 98 percent of the time. Ninety-percent of the pieces that we test would be dropped in a box and then re-delivered to its destination in one day. So if you were to drop that piece on Monday, it would be delivered on Tuesday.
[5] To determine the nature of alleged problems and their impact on voters, we consider extrinsic evidence. See In re Gray-Sadler, 164 N.J. 468, 477, 753 A.2d 1101 (2000); In re Fifteen Voters, 129 N.J.Super. 296, 300-01, 323 A.2d 521 (App.Div.1974).
[6] N.J.S.A. 19:57-23 does not explicitly state the consequences resulting from a ballot not being received as of 8:00 P.M. Cf. Petition of Kriso, 276 N.J.Super. 337, 343, 647 A.2d 1373 (App.Div.1994).